UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-11470-RGS

UNITED STATES OF AMERICA

v.

NSTAR ELECTRIC CO., et al.

MEMORANDUM AND ORDER
ON THE JOINT MOTION OF DEFENDANTS
NSTAR ELECTRIC CO. AND HARBOR ELECTRIC ENERGY CO.
TO DISMISS THE CROSSCLAIMS
OF THE MASSACHUSETTS WATER RESOURCES AUTHORITY

October 27, 2016

STEARNS, D.J.

In 1989, the U.S. Army Corps of Engineers (ACOE) issued a permit to the Boston Edison Company[1] and the Massachusetts Water Resources Authority (MWRA) to install a submarine electric cable beneath Boston Harbor connecting NSTAR's K-Street substation (385-T) in South Boston with the Deer Island Waste Water Treatment Plant (Plant). In this lawsuit,

---

[1] Boston Edison is now known as NSTAR Electric Company d/b/a Eversource Energy (NSTAR). NSTAR was formed in 1999 by the merger of Boston Edison, Cambridge Electric Light Company, and the Commonwealth Electric Company. The court will refer to Boston Edison where historically appropriate. There is, however, no dispute that NSTAR is the successor to Boston Edison for all purposes of this litigation.

the ACOE alleges that defendants violated the permit by failing to bury the cable at the required depth. The ACOE seeks civil penalties as well as injunctive relief in the form of compliance with the permit or removal of the cable.

In response to the lawsuit, the MWRA filed crossclaims against NSTAR and the Harbor Electric Energy Company (HEEC)[2] asserting that the utility companies are solely responsible for the costs of reinstalling or protecting the existing cable. The MWRA also alleges that the utilities refused to negotiate in good faith over a successor to the parties' 1990 Interconnection and Facilities Support Agreement (1990 Agreement), in violation of Mass. Gen. Laws ch. 93A, §11 (Chapter 93A). NSTAR and the HEEC now move to dismiss the crossclaims contending that primary jurisdiction over the dispute rests with the Massachusetts Department of Public Utilities (DPU); that the MWRA's claims are currently the subject of a pending state-court action; that the MWRA's resort to alternative litigation venues amounts to impermissible claim-splitting; and that its claim for declaratory judgment is

---

[2] The HEEC was created by Boston Edison as a wholly-0wned subsidiary tasked with providing the facilities necessary to deliver electric power to Deer Island.

unripe as it has (as yet) suffered no actual harm. The court heard argument on the motion on October 18, 2016.

## BACKGROUND

On May 19, 1989, this court (Mazzone, J.) ordered the MWRA to undertake the construction of the Plant as the cornerstone of a long-term plan to restore the heavily-polluted Boston Harbor. Among its many provisions, the Order mandated that the MWRA "have electrical power available on Deer Island sufficient to commence construction . . . by October of 1990." In response, the MWRA entered into the 1990 Agreement with Boston Edison and the HEEC. Under the 1990 Agreement, the MWRA undertook to amortize and pay for the cost of constructing and operating the cross-harbor cable and the appurtenant electrical transmission facilities over the 25-year life of the contract. The 1990 Agreement included two spending caps setting the MWRA's maximum obligation for construction costs. The first, applicable to the Phase I facilities (including the cable), was $25,400,000. The second, applicable to both Phase I and Phase II facilities, was $41,650,000. "Recovery of construction costs through the Interconnection Agreement is capped such that the HEEC, and not the MWRA, will absorb any costs that exceed the cap." Dkt #30-2 at 8 (DPU approval of the HEEC financing application), citing 1990 Agreement at 8.

The ACOE issued a permit to Boston Edison Company and MWRA to install a 4.15 mile, cross-harbor 115-kilovolt submarine electrical cable to power the Plant.  In January of 1990, Boston Edison incorporated the HEEC to build and maintain the cable.[3]  The following month, the ACOE amended the permit to add the HEEC.  The permit required that the cable be installed at least 25 feet below the sea bed of two federally-owned channels in Boston Harbor, the Reserved Channel and the Main Ship Channel.

NSTAR engaged geotechnical consultants to conduct subsurface investigations.  These revealed bedrock just beneath the sea floor in the Reserved Channel.  NSTAR selected Les Cables de Lyon (CDL) to supply the electric cable.   A CDL subcontractor, Harmstorf, was hired to excavate the cross-harbor trench for the cable.  NSTAR and the HEEC claim that

> during the construction of the Cable, it became apparent that the only way to uniformly reach the specified depths at certain locations would have been blasting through bedrock, which was discouraged by both the [Massachusetts Department of Environmental Protection] and the [ACOE].  Although the depth actually achieved during construction was less than the permit specified in certain locations, it was the maximum achievable depths in those locations utilizing construction methods approved at that time, and depth actually achieved was below the official maximum depth then anticipated and communicated by the [ACOE] for any future shipping needs.

Am. Answer of NSTAR and HEEC ¶ 14, Dkt #20.

---

[3] The DPU approved the delegation to HEEC in 1990.

When completed in 1994, the combined costs for the Phase I and Phase II facilities, exclusive of interest and charges, came to less than $41.65 million, entitling Boston Edison and the HEEC under the 1990 Agreement to an incentive payment of $1.487 million. As amortized over the twenty-five year term of the 1990 Agreement, the costs of the project totaled approximately $104 million (of which $3.475 million is attributable to the incentive award).

In 2000, the Massachusetts Port Authority (Massport) asked the ACOE to undertake a study of the feasibility of deepening the Reserved Channel and the Main Ship Channel to accommodate a new generation of mammoth container ships. The ACOE study laid the groundwork for the Boston Harbor Deep Draft Navigation Improvement Project (Deep Draft Project). During a feasibility exploration, the ACOE discovered that in some locations the cable was not buried to the 25 foot level mandated by the permit – in some areas it lay as little as 12 feet below the sea floor. In 2003, the ACOE notified the three permit holders that the cable's positioning violated the terms of their permit. The ACOE demanded that the cable be reinstalled at the proper depth requirements to allow the Deep Draft Project to go forward.[4]

---

[4] According to the ACOE, dredging for the Project with the cable in its present position would risk damage to the cable, resulting in a loss of power

Prolonged settlement negotiations between the ACOE and the permit holders began in 2003.[5]  NSTAR proposes the placement of protective concrete mats or steel plate structures just above the cable, extending some 1,000 linear feet into the Reserved Channel.  NSTAR and the HEEC estimate the cost of trenching and placing the mats to range from $10 to $20 million, as opposed to the $50 to $100 million cost of installing a new cable.  NSTAR and the HEEC also maintain that any "cable protection costs" they incur are recoverable from the MWRA under the 1990 Agreement.

On October 30, 2015, the HEEC, as "own[er] and operat[or] of a submarine electric cable and related substation and interconnection facilities that are used exclusively for providing distribution service to the MWRA facility," filed a petition with the DPU seeking a tariff "to recover its costs to serve MWRA on and after January 1, 2016."  Dkt #30-1 at 1.  In its tariff petition, the HEEC stated that the MWRA was then "paying for service under a long-standing contract with the HEEC that expires on November 12, 2015 and will not be renewed."  *Id.* at 6 (Pet. ¶ 5).  Thus, it was "seeking (1)

---

to the Deer Island Plant, and the leakage of environmentally harmful fluid into Boston Harbor.

[5] In 2014, Congress passed the Water Resources and Reform Development Act, authorizing $310 million for the Deep Draft Project. That funding, however, expires in 2017.

approval of a tariff that will provide a construct for recovery of prudently incurred costs on a going-forward basis; and (2) approval of a rate consistent with the provisions of the tariff rate mechanism to supplant the amounts currently recovered under the expiring Interconnection Agreement . . . [but] not . . . costs associated with the [ACOE's] dredging."[6]  *Id.* at 25.

While the terms of the 1990 Agreement required the negotiation of a successor agreement, the parties were unable to formalize an extension or new terms prior to the expiration date.  As a consequence, the MWRA filed suit in Suffolk Superior Court on November 11, 2015.  In the Superior Court Complaint (as amended on March 21, 2016), the MWRA disclosed that during the renewal negotiations, NSTAR insisted that it agree to join the ISO-New England Forward Capacity Market and to assign to NSTAR a percentage of any earnings as an offset against the cable protection costs.  The MWRA refused, claiming that it had "no responsibility for the costs," and that its participation in the Forward Capacity Market would "require it to assume a range of operational risks which it was not willing to undertake."  MWRA Mem. at 16.  As in this case, the MWRA sought a declaratory judgment that

---

[6] The HEEC testified at the DPU hearing on the petition that, "going forward," it expects to incur annual operations and maintenance costs of $675,000, and an annual capital recovery cost of $2.9 million. *Id.* at 23 (Tr. at 13).

7

the 1990 Agreement did not obligate it to bear the costs of remediating the cable as it was not "a matter of regular maintenance."[7] MWRA Cross-cl. ¶ 26 (Dkt #15). It also claimed that NSTAR had breached the 1990 Agreement, had refused to negotiate in good faith, and had violated Chapter 93A. On June 24, 2016, the Superior Court dismissed the MWRA's claims without prejudice with the notation that "the amended complaint alleges no facts plausibly suggesting that the MWRA is entitled to relief under any of its causes of action."[8]

On May 5, 2016, the DPU issued an interlocutory order in the tariff proceeding in response to the MWRA's motion to dismiss, ruling that it would exercise "primary jurisdiction" in determining whether the HEEC was required by the 1990 Agreement to file the tariff request with the Federal Energy Regulatory Commission (FERC). The DPU further ruled that the dispute over the recovery of cable protection costs was a matter of contract liability outside its decisional authority. The HEEC moved for

---

[7] MWRA states that "the cable is presently in good working order . . . and is expected to have an additional useful life of 20-25 years." *Id.*

[8] The MWRA appealed the Superior Court's decision, but on September 30, 2016, moved to dismiss the appeal. The Court allowed the motion and dismissed the appeal "without . . . expressing any opinion as to the impact of this decision on any pending or subsequent litigation." Dkt #51-1.

reconsideration, arguing that the dispute involves "interpretation of a special contract under the [DPU's] jurisdiction." Dkt #30-4 at 3. The DPU demurred, stating that it would reach a determination of its jurisdiction over cable protection costs only after such costs were actually incurred: "[B]ecause [the HEEC] does not seek to recover any costs associated with cable protection in its filing and does not propose any tariff provision specifically addressing Cable Protection Costs, the issue of responsibility for Cable Protection Costs is outside the scope of this proceeding." *Id.* at 8.

After efforts to reach an agreement with the permit holders failed, the ACOE brought this lawsuit in the federal district court on July 15, 2016, alleging that noncompliance with the 1990 permit violates Section 10 of the Rivers and Harbors Act of 1899 (RHA), 33 U.S.C. § 403, and Section 404(s) of the Clean Water Act (CWA), 33 U.S.C. § 1344(s).[9]

DISCUSSION

NSTAR and the HEEC seek to dismiss the MWRA's crossclaims, which are: Count I – Judgment "declaring the rights, duties and status of each of the parties to the 1990 Agreement with respect to the extent, if any, of MWRA's obligations thereunder to pay for existing or future Cable

---

[9] The ACOE has moved for summary judgment on liability with respect to the cable remediation project. Briefing on the issue having been concluded, the court has scheduled a hearing for November 14, 2016.

Protection Costs" (Cross-cl. ¶ 31); Count II – Indemnification for "any and all costs or damages incurred by MWRA related to any failure by NSTAR and/or the HEEC to comply with the Permit (*Id.* ¶ 35); and Count III – Violations of Chapter 93A for "unfair and deceptive conduct in attempting to make MWRA responsible for [NSTAR's and the HEEC's] own failure to comply with the Permit's depth requirements and in disregarding the allocation of construction risk provisions in the 1990 Agreement by terminating the 1990 Agreement and claiming that the provisions of that Agreement no longer have any relevance to Cable Protection Costs to be incurred after November 2015." (*Id.* ¶ 44).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Two basic principles guide the court's analysis.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678.  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.  A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

The court will consider the arguments made by NSTAR in support of dismissing the crossclaims and will then address the MWRA's request for declaratory judgment and its Chapter 93A crossclaims.

### *Primary Jurisdiction*

As a matter of taxonomy, primary jurisdiction is a rule of deference and not a rule of jurisdiction in the ordinary sense. *P.R. Mar. Shipping Auth. v. Fed. Mar. Comm'n*, 75 F.3d 63, 65 (1st Cir. 1996). "The doctrine of primary jurisdiction applies to regulatory matters specifically entrusted to a particular agency and to matters involving technical questions of fact uniquely within agency expertise and experience." *Columbia Chiropractic Grp., Inc. v. Trust Ins. Co.,* 430 Mass. 60, 62 (1999), quoting *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 304 (1976). "If an agency has the regulatory power to afford a plaintiff relief, exhaustion of the possibility of remedial agency action should ordinarily precede independent action in the courts." *Id.* The doctrine is particularly applicable when "an action raises a question of the validity of an agency practice." *Murphy v. Adm'r of Div. of Pers. Admin.,* 377 Mass. 217, 221 (1979). "[I]f a court concludes that an issue raised . . . is within the primary jurisdiction of an [administrative] agency, the court will defer any decision in the action before it until the agency has addressed the issue that is within its primary jurisdiction." *Ass'n of Int'l*

*Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Prot.*, 196 F.3d 302, 304 (1st Cir. 1999). Whether to invoke the doctrine is a matter uniquely committed to the discretion of the court. *See Columbia Chiropractic Grp.*, 430 Mass. at 62, citing *Leahy v. Local 1526, Am. Fed'n of State, Cty., & Mun. Employees,* 399 Mass. 341, 349-350 (1987). Resort to the doctrine is particularly inappropriate where the agency in question does not have the power to conclude the issue under a highly deferential standard is unable to act promptly where (as is often true in a commercial context), some urgency is at hand, or where the agency cannot give full and appropriate relief. *PHC, Inc. v. Pioneer Healthcare, Inc.*, 75 F.3d 75, 80-81 (1st Cir. 1996).

Pursuant to Mass. Gen. Laws ch. 164, §94, "all contracts for the sale of . . . electricity by electric companies shall be filed" with the DPU, and electric utility companies are required to obtain the DPU's approval of all rates charged to customers for the sale and distribution of electricity. Citing to Chapter 164, NSTAR and the HEEC maintain that the MWRA crossclaims "fall squarely within the jurisdiction of the DPU," and that Massachusetts courts "routinely dismiss actions in deference to the DPU's authority to decide matters 'exclusively' within its province." Defs.' Mem. at 12. NSTAR insists that the DPU proceeding will resolve an existing "rate dispute" among

the parties, which includes the negotiation of a new Interconnection Agreement covering future Cable Protection Costs. *Id.* at 13.

As *PHC, Inc.* makes clear, the primary jurisdiction doctrine does not apply when the critical issue turns on questions of law which have not been committed to the agency's discretion or where the agency has chosen not to act.[10] As the DPU has determined that the dispute over cable protection cost liability is not properly before it, there is no pending proceeding to which this court could defer.[11] The core point of this litigation is the determination of

---

[10] In its Order on the HEEC's motion for reconsideration, the DPU held that the scope of the rate proceeding "is better addressed if and when such Cable Protection Costs are incurred and *presented for recovery* in a filing before the Department. . . . [A]s previously determined the Department's investigation in this proceeding will be limited to review of the Proposed Tariffs to ensure that any resulting rates are just and reasonable and that the proposed terms and conditions are reasonable." Dkt #30-4 at 8-9 (emphasis added).

[11] It is true, as NSTAR and the HEEC argue, that the DPU has on occasion asserted a broader scope of jurisdiction. As the DPU explains, it

> has exercised jurisdiction over disputes involving commercial customers of utility companies in circumstances when residential tenants were directly or indirectly affected by commercial accounts. . . . when interpretation of tariffs or Department rules, or a utility company's general business practices were at issue. In a few circumstances, the Department exercised its jurisdiction over disputes involving commercial customers of utility companies based on its "general supervision authority" over gas and electric companies under G.L. c. 164.

liability for costs of remediating the cable and bringing the parties into compliance with their permit. This court has jurisdiction to decide these issues, and their prompt resolution is desirable given the looming deadline for the expiration of federal financing of the Deep Draft Project.[12]

### *Claim-splitting*[13]

"Federal claim preclusion law bars a plaintiff from litigating claims in a subsequent action that could have been, but were not, litigated in an earlier suit." *Silva v. City of New Bedford*, 660 F.3d 76, 78 (1st Cir. 2011). Citing the MWRA's prior filing in the Superior Court and the HEEC's pending case before the DPU, NSTAR and the HEEC argue that the MWRA's crossclaims "violate longstanding rules prohibiting 'claim-splitting' and should therefore be dismissed." Defs.' Mem. at 19. As explained by then-Circuit Judge Breyer,

---

Dkt #39-1 at 10 (*Schreiber & Assocs.*, DPU D.T.E. 02-86, June 2, 2003). The assertion of that jurisdiction, however, is rare as hen's teeth and, in any event, the DPU proceeding here is limited by its own terms to a "review of the Proposed Tariffs." Dkt #30-4 at 9.

[12] The MWRA's "held hostage" claim under Chapter 93A is also uniquely within the competence of this court. Where the court will defer to the DPU (or the FERC) under the primary jurisdiction doctrine is over tariff issues involving the HEEC's sale of electricity to the MWRA.

[13] NSTAR and the HEEC also argue that "the MWRA's crossclaims are barred by the prior pending action doctrine." This argument is rejected for the same reasons that lead the court to find the claim-splitting theory inapplicable.

> [u]nless [plaintiff] can fit his case within some exception to the general 'claim preclusion' rule, his federal court claims are barred, for both his state court and his federal court claims grow out of the same 'transaction, or series of connected transactions'. . . . That is to say, [plaintiff] must find an exception freeing him from the legal doctrine against 'claim splitting' — the principle that requires a litigant to assert all his various legal theories and factually related allegations the first time he brings suit.

*Rose v. Town of Harwich*, 778 F.2d 77, 79 (1st Cir. 1985), citing *Boyd v. Jamaica Plain Co-operative Bank*, 7 Mass. App. Ct. 153, 163-164 (1979). The exception that applies here is the one earlier alluded to – "In Massachusetts, as elsewhere, a judgment does not preclude future claims if not rendered 'on the merits.'" *Rose*, 778 F.2d at 79. Because the Superior Court Order was entered "without prejudice," it has no preclusive effect.

### Declaratory Judgment

The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (mirrored by Fed. R. Civ. P. 57), "does not itself confer subject matter jurisdiction, but, rather, makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis. . . . Consequently, federal courts retain substantial discretion in deciding whether to grant declaratory relief." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995). For a claim to be ripe in the declaratory judgment context, two prongs must be met – fitness for review and hardship. *Id.* at 535; s*ee also Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Fitness involves the

question of whether "the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Mass. Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*, 973 F.2d 18, 20 (1st Cir. 1992) (per curiam). "[T]he hallmark of cognizable hardship is usually direct and immediate harm, [although] other kinds of injuries occasionally may suffice." *Ernst & Young*, 45 F.3d at 536. "The key question involves the usefulness of a declaratory judgment, that is, the extent to which the desired declaration 'would be of practical assistance in setting the underlying controversy to rest.'" *Id.* at 537, quoting *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 693 (1st Cir. 1994).

NSTAR and the HEEC, relying on the dismissal order issued by the Superior Court, assert that the MWRA claim for declaratory judgment "fails to identify any actual controversy." Defs.' Mem at 15-16. In the first instance, the Superior Court Order was entered without prejudice and thus has no preclusive effect. *See Mirpuri v. ACT Mfg., Inc.,* 212 F.3d 624, 628 (1st Cir. 2000), quoting *Acevedo-Villalobos v. Hernandez,* 22 F.3d 384, 388 (1st Cir. 1994) ("In this circuit, the phrase 'without prejudice,' when attached to a dismissal order, . . . signif[ies] that the judgment does not preclude a subsequent lawsuit on the same cause of action either in the rendering court or in some other forum."). Even more to the point, the Superior Court Order

entered on June 24, 2016, prior to the ACOE's filing of this case on July 15, 2016. The ACOE's claims for injunctive relief and civil penalties against the MWRA (as well as NSTAR and the HEEC) create "an actual controversy" among the defendants, and the resolution of the MWRA's crossclaims will "set the underlying [liability] controversy to rest." *See Abbott Labs*, 387 U.S. at 148-149.

### *Chapter 93A*

NSTAR and the HEEC argue that even accepting as true the premise of the MWRA's Chapter 93A claim – that they breached the 1990 Agreement by failing to negotiate in good faith by attempting to impose an "un-bargained for and absolute pre-condition" regarding the MWRA's participation in the ISO-New England Forward Capacity Market – the MWRA has failed to plead a viable Chapter 93A violation. This court agrees that there is nothing inherent in the 1990 Agreement requiring the parties to negotiate a successor agreement in good faith. *See Schwanbeck v. Federal-Mogul Corp.*, 412 Mass. 703, 706-707 (1992). Nor as a general proposition will a party be held liable for failing to conduct a successful contract negotiation. *See Lambert v. Fleet Nat'l Bank*, 449 Mass. 119, 127 (2007).

Rather, to rise to an actionable Chapter 93A violation, a party's conduct must rise to the level of "commercial extortion." *Commercial Union Ins. Co.*

17

*v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000), quoting *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 475 (1991) ("A mere breach of contract does not constitute an unfair or deceptive trade practice under [Chapter] 93A, unless it rises to the level of 'commercial extortion' or a similar degree of culpable conduct."). "The courts of Massachusetts have consistently held that 'conduct in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for [Chapter] 93A purposes." *Arthur D. Little v. Dooyang Corp.*, 147 F.3d 47, 55-56 (1st Cir. 1998), quoting *Anthony's Pier Four*, 411 Mass. at 474. In this vein, the Massachusetts Appeals Court upheld a finding of Chapter 93A liability for extortionate conduct where a defendant raised "specious defenses" to payment and engaged in "foot dragging" and "a pattern of stringing [the plaintiff] along." *Cmty. Builders, Inc. v. Indian Motorcycle Assocs.*, 44 Mass. App. Ct. 537, 559 (1998).

In its crossclaim, the MWRA alleges that NSTAR and the HEEC inserted "outrageous" preconditions into the bargaining process by seeking to assign themselves "exorbitant percentages of revenues . . . to pay for the Cable Protection Costs . . . for which it [the MWRA] had no responsibility" and attempting to force it to "assume a range of operational risks" as the price

for obtaining a successor to the 1990 power supply agreement.  MWRA Answer and Cross-cl. ¶¶ 40-41.  For pleading purposes, these allegations are sufficient to survive a motion to dismiss.

## ORDER

For the foregoing reasons, defendants' motion to dismiss the MWRA's crossclaims is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE